STATE *vs.* GREGORIO C. DI NOI.

DECEMBER 15, 1937.

PRESENT: Flynn, C. J., Moss, Baker and Condon, JJ.

CONDON, J.   This is an indictment for murder.   The defendant was tried before a jury in the superior court and was found guilty.   This verdict has been approved by the trial justice, who denied defendant's motion for a new trial.   To this denial of his motion and to numerous rulings made by the trial justice in the course of the trial, the defendant took exceptions and has duly prosecuted his bill of exceptions to this court.   Included in said bill is a further exception, taken to a ruling of another justice of the superior court, denying defendant's motion to examine, before trial, certain material alleged to be in the possession of the attorney general.

Defendant's exceptions are seventy-three in number, but exceptions numbered 12, 13, 14, 15, 17, 18, 19, 20, 23, 26, 35, 36, 37, 38, 39, 43, 46, 48, 49, 50, 51, 52, 53, 55, 61, 62, 63, 69, 71, 72 and 73 are expressly waived.   The exceptions which are pressed are considered here in the order and manner in which counsel for the defendant has discussed them under the several points set out in his brief.   These points, restated in the language of defendant's brief but in interrogative form, are as follows.

I. Was it prejudicial error to deny defendant's motion for leave to examine before trial certain materials in the custody of the attorney general? Exceptions 3 and 4.

II. Was it prejudicial error to allow, over repeated objections, disgraceful, irrelevant and prejudicial cross-examination of the defendant as to the details of his intimate relations with the deceased? Exceptions 29, 30, 31, 32, 33, 34. Also exception 59 (request to charge 23).

III. Was it prejudicial error for the trial justice to refuse to charge the jury as requested in defendant's request to charge number 27, exception being duly noted? Exception 61.

IV. Was it prejudicial error for the trial justice to rule out reputation evidence because it was negative and to refuse to charge as requested in defendant's request number 21? Exceptions 28 and 57.

V. Was it prejudicial error to deny items 7 to 11, both inclusive, as set forth in defendant's motion for a bill of particulars, and thereafter to deny defendant's request to see the original reports of state experts relative to certain substances? Exceptions 1 and 2.

VI. Was it prejudicial error to allow the state to ask leading questions of its own witness on a disputed matter of vital significance in the case? Exceptions 6 and 7.

VII. Was it prejudicial error to permit the state's witness, Captain Franklin, to testify to a material fact on being recalled by the state, which fact he stated he did not know in his direct examination? Exceptions 8 and 9.

VIII. Was it prejudicial error to allow hearsay evidence to be introduced by the state? Exceptions 10, 11, 16.

IX. Was it prejudicial error for the court to refuse to charge as requested by the defendant in his requests numbered 6 and 8, exception being duly noted? Exceptions 44, 45.

X. Was it prejudicial error in the ruling of the trial justice to order question and answer 388 in cross-examination

of the state's witness, Mrs. Jarvis, to be stricken, exception being duly noted? Exception 5.

XI. Was it prejudicial error for the trial justice to deny .the defendant a new trial because he did not have a full, fair and impartial trial? Exception 70 (includes all the following exceptions: 21, 22, 24, 40, 41, 42, 47, 58, 60, 64, 65, 25).

XII. Was it prejudicial error for the trial justice to deny defendant's motion for a directed verdict and for a new trial on the grounds that the verdict was against the law, the evidence, and against the weight of the law and the evidence? Exceptions 27, 66, 67, 68.

It appears from the evidence that on Tuesday, December 3, 1935, in the late afternoon, there was discovered, lying on the kitchen floor of the first-floor tenement at 12 Tobey street in the city of Providence, the dead body of one Carmella Bruno. The body bore marks about the head and hands which indicated that the deceased had come to her death from the blows of a blunt weapon in the hands of another. A careful examination of the tenement and the objects therein failed to disclose any fingerprints. There was found, however, on an upper shelf in the closet of another room in the tenement two parts of a stove shaker on which were discovered spots of blood. This shaker had apparently been used by the person who killed the deceased and had then, by such person, been hidden in the closet. The kitchen was spattered with blood in various places and there was a pool of blood at the side of the body. These things, and other indications on the body, pointed to the belief that there had been a brief struggle before the deceased was subdued and killed by several blows inflicted on her head by the killer, probably with the stove shaker.

When the deceased was discovered, the shades in the kitchen were fully drawn and no one was found in the tenement. Upon examination of her body by the medical examiner, it was evident that she had been dead for two or three days, and that she had probably been killed in the af-

ternoon or evening of the preceding Saturday, November 30, 1935. While no clues were found in the tenement leading to the belief that any known person was guilty of the crime, suspicion was directed at the defendant, who had been intimate with the deceased and who had quarrelled with her on several occasions, making, at the same time in the presence of others, threats to kill her. One of these threats had come to the attention of the police a few weeks previous to the death of the deceased, and with this as a starting point, the defendant was arrested for questioning. Two officers went to defendant's home a short time after the discovery of the body and found him preparing his evening meal. He professed surprise at their visit and wanted to know why they were arresting him.

The defendant was taken to the home of the deceased and was confronted there with the body of the murdered woman still lying on the floor in the position in which it had been discovered. In the presence of several police officers and within the hearing of several others, he was asked if he had committed this crime and he replied, substantially, to the effect: "You no see me do it. I no see you do it. You got to prove that I do this." He was immediately taken to the central police station and was questioned at length by several officers, but at no time did he admit that he had killed the deceased or that he had anything to do with the homicide.

During the evening of December 3, 1935, two officers searched defendant's tenement on Diamond street and found articles of clothing on which were blood spots. An examination of his overcoat, hat and shoes disclosed the presence of further blood stains. These stains were submitted to the state pathologist for inspection and were found, in several instances, to be human blood. The pathologist also inspected scrapings obtained from under the fingernails of the defendant and found blood and live epithelial matter, or live skin, in some of them.

The defendant was thereupon duly charged with the murder of Carmella Bruno and was bound over to the grand jury by the district court of the sixth judicial district. On March 2, 1936, the grand jury for the counties of Providence and Bristol duly indicted him for that crime, and on the indictment he was arraigned, tried and convicted.

Defendant now contends, under the several points above set out, that, because of alleged errors, he was deprived of a full, fair and impartial trial and therefore is entitled to a new trial or to be discharged.

By far the greater number of defendant's exceptions have to do with the admission or exclusion of evidence and with the lack of opportunity afforded him to examine and inspect, before trial, materials alleged to be in the possession of the attorney general, which defendant contends it was necessary for him to inspect a reasonable time in advance of being forced to proceed to trial in order to prepare properly his defense. These exceptions will now be considered. Later, defendant's exceptions, relating to other matters, will be discussed, but in treating them we shall follow the method adopted by defendant's counsel in his brief under the several points above set out.

Point I. The defendant filed a motion before trial for permission to examine certain materials in the possession of the attorney general, consisting of the following items: (a) The blunt instrument used in the alleged murder; (b) any specimen of skin, blood or hair taken from the defendant's body or from underneath his fingernails; (c) any specimen of skin, blood or hair taken from the body of the deceased, and any substance taken from underneath her fingernails, during the investigation by the state's agencies of the alleged murder. He also at this time filed a motion for the appointment of an expert to examine these materials on his behalf so that he might meet certain testimony of a like expert which he expected would be offered on the part of the state. The justice of the superior court, who heard the motions, de-

nied the first motion and in view of that denial the second motion was not pressed at that time. Later, at the call of the case for trial in the superior court and prior to the empanelling of the jury, both of these motions were renewed and again denied, this time by a different justice of the superior court who was then presiding at the trial.

It appears from the record that the materials referred to under (b) and (c) were obtained, at the request of the Providence police department, by Mr. Bohrer, then in the employ of the state as a toxicologist, and taken by him to the office of Dr. Round, the state pathologist, for scientific examination. Shortly thereafter these materials were treated with certain solutions, fixed into paraffin blocks, so-called, and then sliced into exceedingly fine sections for minute examination under the microscope. In the course of this procedure, blood slides, so-called, were also made for the purpose of testing the material for blood, generally, and more particularly for human blood. The results or findings of this examination of these materials under the microscope and of the tests for blood were then reduced to written notes by Dr. Round and from these notes he testified at the trial that human blood was present on the shoes and clothing belonging to the defendant, which had been taken from his tenement or from his person, and that he also found live skin in defendant's fingernail scrapings.

The blood slides, paraffin blocks and the tubes containing the various materials, which the state pathologist had taken for the purposes of this scientific examination, were not available at the trial and were also, apparently, not available in April 1936, when defendant made his first motion to inspect these materials. Dr. Round testified that the last time he saw the blood slides and paraffin blocks was in the middle of winter, about Christmastime, and that he did not see them again because they were either lost or inadvertently destroyed during several removals of his office and laboratory from one room to another, due to the construction of a

new addition to the state office building, which was then in progress. It thus appears that these materials were at no time in the possession of the attorney general and that at the time of defendant's motion, they were not known to be in existence. An order of the court to produce them would, under such circumstances, have been futile.

The blunt instrument, namely, the stove shaker, probably was in the custody of the attorney general and, in any event, he could have produced it if ordered to do so. However, the justice who heard the motion denied it *in toto* and observed: "If, during the trial, it appears that justice to the defendant requires that his expert be permitted to examine exhibits, the Court can then permit the same, affording to the State the protection which may seem proper and just at that time." In line with this observation, the defendant was accorded an opportunity to have his expert examine the stains on the exhibits introduced in evidence by the state but defendant's counsel says in his brief that the stains were dry and hence such examination proved futile.

The defendant, however, offered no testimony that these stains would have been any more serviceable for the purposes of such an examination in April, when he made his first motion, than they were in the succeeding June, when his expert was finally permitted to examine. Be that as it may, the question here is whether the defendant was entitled, as a matter of right, to such preliminary examination or inspection of this evidence, which the state had obtained through its own investigation of the alleged crime, or if not, did it rest in the sound discretion of the justices below to grant defendant's respective motions and, if so, was it an abuse of discretion to deny such motions under the circumstances of this case.

Defendant contends that the more modern development of the law of evidence on this question accords such a right to him, and in support of this contention he cites 3 Wigmore on Evidence, § 1863, *People* v. *Buzan*, 351 Ill. 610, *Newton*

v. *State*, 21 Fla. 53, 72. As far as we are aware, this right of inspection of the state's evidence has never been accorded to the accused in this state, and that portion of the text of Wigmore, above cited, states that the common law denied such right, although the distinguished author argues for what he calls a modern rationalization of the common law that would grant this right to a defendant in a criminal case. The above-cited cases from Illinois and Florida seem to incline toward this view. They are not, however, persuasive.

The rule of the common law on this question has long been followed in this state. No evidence of general dissatisfaction with that law has come to our attention, and we know of no efforts having been made to have the legislature alter or liberalize it in favor of defendants in criminal cases. Whether or not it is desirable or proper to declare by judicial opinion that the rule has outlived its day, we do not undertake to say, but on the showing in the instant case we see no reason for departing from it in favor of this defendant. It is conceivable that, under special and unusual circumstances, an occasion may arise when a strict adherence to the rule would amount almost to a denial of a defendant's constitutional rights. On such an occasion, it would, in our opinion, be within the sound discretion of the trial justice to relax the rigor of the rule to a sufficient extent to assure the defendant a reasonably fair opportunity to prepare his defense. The test in such a case would be whether or not there was a real necessity for the defendant to inspect the articles in the custody of the state, in order to be able to make such preparation. Such a necessity would arise but rarely and it does not appear to exist in the instant case. There was no error in the denials of the defendant's motions, and his exceptions under this point are therefore overruled.

Point II. The exceptions upon which the defendant bases his contention under this point relate to the admission of certain evidence of the defendant's relations with the deceased, particularly those of an intimate sexual nature. The

defendant took the witness stand and testified in direct examination that he was married and had a wife and child living in Italy, but that he had lived here in America for some twenty years and since 1932 had lived or consorted with the deceased as man and wife. Thereupon, the state proceeded on cross-examination to draw from him testimony as to his sexual intercourse with the deceased with particular reference to the occasions thereof and their number, and also as to the last time he desired such intercourse prior to his last seeing the deceased alive. The defendant contends that such cross-examination tended to bring to the attention of the jury "lurid details" of his sexual relations with the deceased and to "magnify" them; that he was thereby degraded and held up to the jury as a depraved person who had a motive to kill the deceased.

We do not agree with these contentions. From the accused himself came the information to the jury that he had consorted with the deceased illegally. Further questioning, designed to show the extent of that intimacy and the time when a desire for it last existed in the accused prior to the death of the deceased, could not have prejudiced him with the jury more than he was already prejudiced by his own testimony regarding his illicit relations with the deceased and his callous disregard of his absent wife and child. The cases cited by the defendant are not in point on this view of the testimony and therefore need not be discussed.

The refusal of the trial justice to charge the jury as to this evidence in accordance with defendant's twenty-third request was not error, as no claim was made by the state that this evidence was for the purpose of leading the jury to the conclusion that, if the defendant was guilty of adultery, he might likewise be guilty of the crime of murder as charged in the indictment. A careful reading of the transcript gives the impression that this evidence was directed to showing the intensity of the passion that the defendant entertained

toward the deceased and the mastery it had over him, as indicated by other testimony admitted without objection. Taken in connection with evidence of imperiousness in demanding what he conceived to be his rights in the home of the deceased and his expressed will to exclude others from that home, this evidence of his sexual desires and the gratification of them by the deceased was clearly admissible to give the jury a complete picture of the nature of this illicit relationship so that it might appear whether or not it was always the mutually pleasant and harmonious affair which the accused represented it to be in his direct examination. For the above reasons, we are of the opinion that the exceptions under this point do not disclose any error, and they are accordingly overruled.

Point III. The exception relied upon under this point rests upon the refusal of the trial justice to grant defendant's twenty-seventh request to charge the jury as follows: "The jury is instructed that the testimony of experts is to be weighed in the same manner as that of any other kind of witness and should be viewed by the jury as advisory only. It should be weighed and considered in connection with all the evidence in the case and they may be entirely or partly disregarded if the jury is convinced that the experts are not correct." Assuming that this request properly states the law, it does not necessarily follow that the defendant was prejudiced because the jury was not charged in this specific manner. Dr. Round and Mr. Bohrer, the experts referred to, testified that, as a result of professional examinations made by them of certain spots or stains on some of the defendant's clothing and shoes and on the stove shaker, said stains or spots were blood stains and in certain instances human blood.

Mr. Bohrer also testified that he scraped beneath the fingernails of the defendant on the night of his arrest and Dr. Round testified that he examined these scrapings and found human blood and live epithelial matter in them. This was

the whole point and purpose of their testimony, namely, that human blood was found upon the defendant and on his clothing. If the charge misled the jury into the belief that they must accept this testimony as conclusive, that these stains were blood and more particularly human blood, and that there actually was blood and live skin in the fingernail scrapings, that would have been error, but we do not think such was the case. The trial justice, several times in the course of his charge, took the pains to impress upon the jury that they and they alone, were the sole judges of the facts in the case and that it was their prerogative to accept or reject in whole or in part the testimony of the witnesses, whether of a direct or a circumstantial nature. Such instruction was made even more emphatic when, granting defendant's second request to charge, the trial justice took the precaution to say: "Suppose you believe that the blood, *if there was blood,* under his fingernails and the other matter there found came from his contact with Joseph Hughes. That is a circumstance for you to consider. You would also of course take into consideration *whether or not there was live skin,* skin that was alive at the time that it entered under his fingernails. *If you believe it,* then it is believable evidence. . . . It is a question what effect the evidence has upon you, not merely that it is in here but what effect it has in your mind when you consider it." (italics ours)

It seems to us that this additional instruction left the jury in no doubt of their power to accept the evidence, all of the evidence, including that of the experts, so-called, or reject it if to their minds it was not believable or not worthy of credit. Certainly it cannot be fairly said that the charge taken together with the additional instructions given by the trial justice in granting certain requests of the defendant, misled the jury into the belief that they were compelled to accept the testimony of the experts in the absence of testimony of a like character in contradiction. There was no

error, therefore, in refusing defendant's twenty-seventh request to charge, and his exception based thereon is overruled.

Point IV. Defendant contends hereunder that the trial justice committed error in two instances with reference to evidence of defendant's reputation as a peaceable man, first, by excluding negative testimony of such reputation, and, secondly, by denying defendant's twenty-first request to charge the jury on this matter as follows: "Evidence that the good character and reputation of the defendant had never been denied or doubted or even discussed or spoken of among his acquaintances, although negative in form, is of the highest value and should be considered by the jury along with all the other evidence."

As to the first ground, there is no merit in the defendant's exception. The testimony of the witness Leonard, which was stricken out on the ruling of the trial justice because it was inadmissible, was not competent to prove reputation, as the testimony did not show the witness had had a sufficient opportunity to acquire knowledge of defendant's general reputation in the neighborhood where he lived. It appears that Leonard lived for three years near Diamond street, where defendant resided, but had only known defendant for about eight months. He testified that he had associated with persons who knew the defendant but he admitted that he had never discussed defendant's reputation with them. The witness was then asked the question: "Have you ever heard any of them say he was quarrelsome?" This question was ruled out on the objection of the state.

The weight of authority and the better reasoning, it seems to us, support the view that negative evidence of reputation is admissible. But for such evidence to be received, it must be first shown that the witness was so situated with reference to the defendant's residence or circle of acquaintances that the fact of his hearing nothing against the defendant's reputation for peaceableness could reasonably be considered as

strongly tending to show that the defendant, in his commu-
nity and among those who knew him best, was regarded as a
peaceable man. *People* v. *Van Gaasbeck,* 189 N. Y. 408; *Gif-
ford* v. *People,* 148 Ill. 173; *Day* v. *Ross,* 154 Mass. 13; *Com-
monwealth* v. *Tyahla,* (Pa. Super. Ct.) 194 A. 322. The wit-
ness here was not so situated. The question was clearly im-
proper because it called for merely the opinion of any of the
persons with whom the witness had conversed and not for
the general reputation of the accused in the community
where he lived.

As to the second ground, the defendant was clearly not
entitled, as a matter of right, to the instruction requested.
It was not incumbent upon the trial justice to characterize
the quality of negative evidence of reputation or to refer to
it specifically at all in his charge. All that the defendant was
entitled to was an instruction that evidence of his general
reputation for peaceableness was proper for the jury to con-
sider in determining whether or not he had exhibited ten-
dencies of a nature which would make it likely that he would
have committed the crime charged in the indictment.

In view of certain other testimony as to reputation and of
a statement made to the jury by agreement, that three men
who worked with defendant would testify, if present, that
they knew the defendant's general reputation in the com-
munity as a peaceful man and that they knew his reputation
to be good as a peaceful man, it became necessary for the
trial justice to charge the jury on reputation, which he did,
as follows: "There is evidence here as to the defendant's
good character in certain respects. Well, that is proper evi-
dence upon the part of the defendant. When a man who has
led a good life or has had a good character in certain respects
is accused of a crime, he is entitled to cast into the scales his
good name or his reputation, to weigh as far as it will in his
favor. You are to consider that as part of the evidence here
and give it such weight as you think he is entitled to or it is
entitled to." This charge fully protected the defendant's

right to have his reputation weighed and considered by the jury. There was no error, and defendant's exceptions under this point are therefore overruled.

Point V. Under this point defendant contends that the trial justice committed error in denying his motion for a bill of particulars, as to names and addresses of all persons who examined the body of the deceased or any part or substance thereof and of any and all persons who so examined the defendant's body; a true and exact copy of the report and findings of any person who examined blood specimens from the premises, the apparel on the body of the deceased; and also of any and all persons who examined the substance or substances found under the fingernails of the deceased and of the defendant. This is, in our opinion, a demand for the disclosure for the use of the defendant, in advance of trial, of evidence on which the state relies to prove its case. It is not a request for particulars of the crime charged in the indictment.

The defendant states in his brief that the argument advanced in support of his first point is pertinent here. The production of documents and chattels in the custody of the state and the disclosure of names and addresses of witnesses to be used by the state against the defendant is, in some jurisdictions, demandable by the defendant as of right, but such is not the law in this state. At common law the defendant enjoyed no such right. 3 Wigmore on Evidence, §§ 1850, 1863.

In some states this strict rule has been relaxed by legislative reversal, of the ancient policy of the common law. Such an improvement, if it be an improvement in the law, has not yet been made by our general assembly. If, at the trial, special and unusual circumstances justify according such a privilege to the defendant, the trial justice who is in a position to see the need and the justice of such a privilege may, in his sound discretion, order the same to be done. We find nothing in the record which would justify us in saying that

this defendant should have been accorded that privilege. There is no error in the ruling of the trial justice, and defendant's exception is therefore overruled.

Point VI. The defendant contends under this point that certain questions asked by the state of one of its own witnesses on a disputed matter of vital significance to the defendant were leading and were therefore prejudicial to his right to a fair trial. We have carefully considered the portions of the testimony referred to in the transcript and, in our opinion, it clearly appears therefrom that the defendant was not prejudiced by the manner of the state's examination of this witness. Defendant's exceptions are therefore overruled.

Point VII. There is no merit in this exception and it is accordingly overruled. We are of the opinion that the matter complained of is more properly a matter which raised a question for argument to the jury rather than a question of law.

Point VIII. The defendant contends under this point that prejudicial error was committed by the trial justice in permitting Captain Burns of the Providence police department to testify as to certain complaints made to him by the deceased against the defendant on several occasions prior to her death. It appears from the testimony of Captain Burns that sometime in September 1935, the exact date is not given, Carmella Bruno came to him at the Central Police Station and made a complaint against one Gregorio Di Noi, the defendant here. As a result of this complaint, he ordered Gregorio Di Noi "picked up and brought to the station for questioning." When he was brought into the station Captain Burns took him to his office, where Carmella Bruno complained that Di Noi had been annoying her by constantly walking up and down in front of her house, and that he had threatened to kill her. Captain Burns testified that this was all said in the presence of Di Noi and that he

denied what the deceased had said. He further testified to other conversation which he had with the defendant on this occasion with reference to this complaint of Mrs. Bruno and that he had warned Di Noi that, if it could be proven he had made these threats, he would be placed under arrest on a threat to kill charge, but that it was the lack of witnesses which prevented him from being arrested then and there, upon Mrs. Bruno's complaint.

Captain Burns further testified that this was the only time he saw the defendant at the station and that he did not see him again until the night of December 3, 1935, when Di Noi was brought to the house at 12 Tobey street, to be confronted with the dead body of Carmella Bruno.

On cross-examination, however, defendant's counsel reopened the matter of this complaint as follows: Q. "Who made the complaint to you in the month of September 1935?" A. "Mrs. Bruno." Q. Mrs. Bruno?" A. "Yes." Q. "Well, who made that particular complaint? Was it made by telephone or by letter?" A. "She came to the station." Q. "She called at the station?" A. "And that is how she was brought in to me. She came to the station to make a complaint and then they brought her over to me to my office." Q. "And you talked to her?" A. "I did." Q. "And did you immediately send for the defendant?" A. "I sent out to have him picked up, then." Q. "Was Mrs. Bruno in your office while you went out for the defendant?" A. " Well, she probably didn't remain at my office but when he was apprehended I had her come back into my office." Q. "You had him taken to your office?" A. "Yes." Q. "And at that time no charge was placed against him?" A. "No, there wasn't."

After thus taking the witness back over the field of his testimony in direct examination, counsel went a step further and asked: "You received no further complaints from Mrs. Bruno?" A. "Yes, I did receive further complaints from

Mrs. Bruno." Q. "From Mrs. Bruno?" A. "Yes." He then dropped this line of inquiry and proceeded to cross-examine the witness on the phases of his testimony not connected in any way with these other complaints. Immediately upon re-direct, however, the state proceeded to explore further the nature of these complaints over the strenuous objections of defendant. We quote the pertinent parts of the testimony objected to. Q. "You said in answer to Mr. Grande's question you had received other complaints from Mrs. Bruno?" A. "Further complaints." Q. "Yes." A. "Yes, I did." Q. "About whom?" A. "About the defendant." Q. "I don't ask you to quote anybody's exact language. I want to know what the complaint was about." A. "About the defendant making threats against Mrs. Bruno." Q. "Threats to what?" A. "To kill."

The defendant contends that this was a violation of the hearsay rule and therefore erroneous. The state, on the other hand, argues that under the rule of completeness, it was entitled in cross-examination to go as far as it did to determine what those further complaints were. Whether or not there was a violation of the hearsay rule or whether this line of interrogation constituted an exception to that rule does not appear to us to be of any importance in the situation which was created by defendant's counsel in inquiring about other complaints. There had already been admitted positive testimony of the defendant's threat to kill Mrs. Bruno, concerning which she had made a specific complaint to Captain Burns in the defendant's presence. This additional testimony from the same witness of the bare fact of Mrs. Bruno having made further complaints of the same kind was not of such great moment as to justify us in finding that such testimony was prejudicial to the defendant. We are of the opinion that if there was any prejudice to the defendant, it was very largely of his own making. Certainly to have left the jury to conjecture about those further complaints, which defendant developed on cross-examination,

would hardly have been less harmful than to permit them to know the nature of such complaints, which was the most that was brought out in the re-direct examination, to which objection was made. Under all the circumstances, we are strongly of the opinion that we would not be warranted in holding the admission of this evidence to be prejudicial error requiring us to order a new trial.

In so far as exception sixteen under this point relates to defendant's contentions made with reference to exceptions ten and eleven, it is without merit, and all of defendant's exceptions under this point are overruled.

Point IX. The defendant's requests numbered six and eight, quoted below, were refused by the trial justice and defendant contends under this point that such refusal was prejudicial error warranting a new trial. The sixth request is as follows: "In this case, the State must prove all the circumstances necessary to its case beyond a reasonable doubt; all of them must be consistent with each other, and taken together, they must point surely and unerringly in the direction of the defendant's guilt before the jury may return a verdict of guilty." The eighth request follows: "Before the jury may convict the defendant upon the circumstantial evidence in this case, these circumstances must each be proved beyond a reasonable doubt, they must form a complete chain that points to the defendant's guilt and the facts must be such that no reasonable theory of defendant's innocence is possible; and these facts must be such as to exclude to a moral certainty every hypothesis except the guilt of the defendant."

The defendant admits that the charge as given substantially covers the law as requested, but that it was fatally defective in failing to charge on "the chain of circumstances pointing surely and unerringly to the defendant's guilt."

The defendant's authority for his statement of the law is Underhill on Criminal Evidence, 4th ed. § 18, and he appears

to have incorporated in his request the language of the text. Of course it was not incumbent upon the trial justice to use the precise words requested if, in his own words, he made it clear to the jury that all the circumstances necessary to the proof of the crime charged must be proved to them beyond a reasonable doubt, that taken together those circumstances must convince them beyond a reasonable doubt of the defendant's guilt and that on no reasonable hypothesis could they possibly point to his innocence. We think the trial justice performed this duty in his charge and that it was further emphasized in the minds of the jury by his granting defendant's third request to charge and his comment thereon as follows: "All the facts and circumstances taken together which have been proven beyond a reasonable doubt must not only be consistent with the inference that the defendant is guilty, but they must at the same time be inconsistent with the hypothesis or theory that he is innocent and with every other reasonable hypothesis.

"Now, that is true. Where the facts, the essential facts, have been proved beyond a reasonable doubt, if there is still something wanting, so that although certain facts are proved beyond a reasonable doubt, the ultimate fact, the guilt of the defendant, is not so proved, he is entitled to the verdict of not guilty." There was no error therefore in refusing defendant's sixth and eighth requests and the exceptions relied on under this point are accordingly overruled.

Point X. The exception under this point is so lacking in merit that it need not be discussed and is therefore overruled.

Point XI. We shall not discuss in detail all of the exceptions grouped under this point. We have, however, carefully considered each one of them to determine whether, if taken singly or collectively, they furnish a sound basis for holding that a prejudice was created against the defendant entitling him to a new trial. Several of these exceptions pre-

sent debatable questions of propriety in the conduct of the prosecution, but in no single instance is there, in our opinion, a sufficient showing to constitute prejudicial error. We are also of the opinion that such instances of alleged improper conduct, even if they could be considered collectively under the exceptions as taken by the defendant, did not serve in their totality to deprive him of a fair and impartial trial. All of the exceptions under this point are therefore overruled.

Point XII. The twenty-seventh exception under this point is to the denial of defendant's motion at the conclusion of the state's evidence to dismiss the indictment and release him from custody. Defendant contends that at this stage of the trial there had been presented to the jury no legal evidence which required him to go forward with evidence on his part and that he was therefore entitled to the direction of a verdict. We cannot agree with this contention. A careful perusal of the transcript indicates clearly that the crime of murder had been committed on the deceased and that the defendant had been, by proof of a series of circumstances of strong probative force, connected with the crime so that a case had been made out against him which necessitated submitting the issue of his guilt to the jury. Without again discussing the evidence, we are of the opinion that there was, at this stage of the trial, evidence which, if believed by the jury, would justify them in finding the defendant guilty beyond a reasonable doubt. This being so, it was not error to deny defendant's motion.

The remaining three exceptions under this point are to the denial of defendant's motion for a new trial. We have carefully read the transcript in this case and have considered with care the evidence presented therein. There are several instances of minor contradictions in the state's evidence but these were, in our opinion, properly left for the jury to determine in considering and weighing the testimony of the witnesses. As to the failure of Captain Burns to hear the ex-

pressions of the defendant when confronted with the body of the deceased at her home, we think this also was properly a matter for ultimate determination by the jury. Whether or not it was strange or peculiar that the captain, who was the one who thought of the defendant as the person who might be connected with the crime, and who had ordered him brought to the scene of the murder to be confronted with the body of the deceased, should leave the room just at the moment the defendant was brought in to view the corpse, was a circumstance which could properly be called to the attention of the jury in argument. This only raised a question of the credibility of the captain's testimony and of the weight thereof. Those questions have been passed upon by the jury and they have found against the defendant. Their verdict has been approved by the trial justice and we shall not disturb it, as we do not find in the record any warrant for doing so. On the contrary, the record, in our opinion, clearly discloses sufficient evidence to support it. There was no error, therefore, in the decision of the trial justice in denying defendant's motion, and the remaining three exceptions under this point are overruled.

All of the defendant's exceptions are overruled and the case is remitted to the superior court for further proceedings.

*John P. Hartigan,* Attorney General, *John J. Cooney,* 2nd. Asst. Atty. Gen., for State.

*Martin M. Zucker, G. William Grande,* for defendant.