STATE

v.

**Michael LAMBERT.**

No. 96–487–C.A.

Supreme Court of Rhode Island.

Dec. 22, 1997.

958

Annie Goldberg and Aaron Weisman, Assistant Attorneys General, for Plaintiff.

Paula Rosin, Janice Weisfeld, Assistant Public Defenders, Mark Smith, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the appeal of the defendant, Michael Lambert (Lambert or defendant), from a judgment of conviction of murder in the second degree and of committing a crime of violence while armed with a firearm. For the following reasons, we sustain the convictions. A summary of the facts pertinent to this appeal follows.

## Facts and Procedural History

At about 6:30 p.m. on Thanksgiving Day, November 24, 1994, Lambert, two months before turning eighteen, and William Page (Page), aged eighteen, were walking in downtown Providence near the I–95 on-ramp at Francis Street. Lambert was throwing rocks as the pair approached the train tracks that run under the overpass. Sylvester Gardiner (Gardiner), a homeless man who was living under the highway, apparently shouted at the teenagers, and a confrontation between Gardiner and the youths ensued. Lambert testified at trial that Page approached Gardiner and pulled out a BB gun that looked like a bullet-firing pistol. Lambert further testified that after having forced Gardiner to lie on the ground, Page directed Lambert to find a rope with which Page then hog-tied the victim. Although acknowledging that the gun actually belonged to him rather than Page, Lambert claimed that he was unaware that Page had it with him that night. Page's statements to the police about what transpired that night differed significantly from Lambert's, but it is undisputed that Gardiner was the victim of a savage and brutal beating that resulted in his death. In their statements to the police both youths admitted delivering at least some of the blows that fell upon Gardiner. These statements were later introduced as evidence in their separate trials. Gardiner's body was found by the police on the morning of Saturday, November 26, 1994, after they had been led to the scene of the crime by one Harry Smiley, a homeless man who knew both Page and Lambert from the streets.

The same day that Gardiner's body was found, Major Stephen McCartney (McCartney) of the Providence police department, patrolled the Smith Hill area of Providence with photographs of the two suspects. At approximately 11:30 p.m., McCartney apprehended Page and Lambert as they were walking in that vicinity. The police had been given their names in connection with Gardiner's murder by several other young people who lived downtown. McCartney testified at trial that upon apprehending the pair, he asked Lambert and Page to identify themselves but did not question them further. At the time, Lambert told McCartney that he was "Michael Nickerson," although he later identified himself with his correct name at the police station, where the two suspects were held separately before Lambert was transferred to the Juvenile Bureau.

At the police station Lambert was questioned by Detective James Allen (Allen) in the early morning hours of November 27, 1994. Allen knew that Lambert was a juvenile and asked Lambert about contacting his mother or father. Lambert responded that he had not been in touch with his parents for several years and that he did not know how to reach them. Lambert did tell the detective that he was a ward of the Department of Children, Youth and Families (DCYF), that he was supposed to be living at a nearby group home but had run away, and that he had a social worker from DCYF named Jennifer Harrison. The police made no effort to notify either DCYF or the group home that Lambert was in police custody.

Allen and Detective Niko Katsetos (Katsetos) had Lambert read a form that stated his *Miranda* rights. The form was reviewed with Lambert, who then signed it after initialing each right to indicate his comprehension thereof. Lambert then proceeded to give the police a statement that implicated both himself and Page in the beating of Gardiner.

On March 3, 1995, Lambert and Page were charged by indictment with the murder of Gardiner. Lambert's pretrial motion to suppress his statement to the police was denied by the trial justice. His trial in January 1996 resulted in a jury verdict of second-degree murder and of committing a crime of violence while armed. Lambert's motion for a new trial was heard and denied on February 1, 1996, and on April 4, 1996, the trial justice sentenced Lambert to a term of life imprisonment on the murder count and an additional ten-year sentence, to run consecutively, on the count of committing a crime of violence while armed with a firearm.

Lambert filed a timely notice of appeal with this Court in which he cited four errors: (1) his statement to the police should have been suppressed because he did not knowingly, voluntarily, and intelligently waive his

rights to counsel and against self-incrimination; (2) the trial justice improperly allowed a witness to testify at the trial regarding certain out-of-court statements made by Page; (3) the trial justice erred in instructing the jury on the law of aiding and abetting; and (4) the trial justice erred in refusing to instruct the jury on the legal relevance of admitted evidence about Lambert's "good character." Additional facts will be provided as necessary in discussing the issues raised by this appeal.

### Validity of Waiver of *Miranda* Rights

The defendant argued that the trial justice committed reversible error by denying his motion to suppress the statement that he gave to the police. Specifically, defendant claimed that he had not knowingly, intelligently, and voluntarily waived his right to counsel and his right against self-incrimination because he "did not understand the consequences of speaking freely to the police * * * [and because the police] made no attempt to contact an adult interested in the well being of [defendant] before interrogating him about the murder." In addition, defendant averred, the waiver of his *Miranda* rights was deficient because he "was never told that he could be tried in adult court and sentenced to a term of life imprisonment." Moreover, he continued, his subsequent statement to the police was involuntary because it was the product of "coercive police activity." We disagree with defendant's contentions.

It is well settled that "the validity of a juvenile's waiver of his or her rights should be evaluated in light of the totality of the circumstances surrounding that waiver." *State v. Campbell,* 691 A.2d 564, 567 (R.I. 1997) (quoting *In re Kean,* 520 A.2d 1271, 1276 (R.I.1987)). Such an evaluation conforms to the directive of the Supreme Court of the United States in *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197, 212 (1979). As we have observed,

"[T]he totality-of-the-circumstances test requires consideration of all of the circumstances surrounding the interrogation of a juvenile suspect, including the juvenile's age, experience, education, and intelligence, his or her capacity to understand the *Miranda* warnings and the consequences of waiver, and the presence of a parent, a guardian, or an interested adult." *Campbell,* 691 A.2d at 567 (citing *In re Kean,* 520 A.2d at 1274–75).

It is undisputed that Allen did not attempt to contact either defendant's parents or a DCYF social worker, whose name had been furnished to the police by defendant. It is further undisputed that defendant was not informed that he could be tried as an adult and sentenced to a term of life imprisonment. We have held, however, that the absence of a parent, a guardian, or an interested adult at the time of waiver does not, alone, render the waiver constitutionally infirm, *In re Kean,* 520 A.2d at 1276, inasmuch as a juvenile has no constitutional right to have an adult present at an interrogation. *Fare,* 442 U.S. at 725–26, 99 S.Ct. at 2572, 61 L.Ed.2d at 213. Therefore, in the absence of a statutorily imposed affirmative duty on police officials to locate a parent, guardian, or interested adult prior to advising a juvenile in custody of his or her rights and taking a statement from that juvenile, the police are under no obligation to do so. We decline defendant's invitation to impose such an obligation judicially and adhere to the view that, in the context of juvenile waivers, "[w]e are not prepared to place further requirements upon police officers beyond those suggested by the Supreme Court of the United States [in *Fare* ]." *In re Frances J.,* 456 A.2d 1174, 1176 (R.I.1983).

Moreover, we have held that the failure to inform a juvenile defendant that he or she may be prosecuted as an adult is not dispositive of the constitutionality of the subsequent waiver of his or her rights to remain silent and to have counsel present during interrogation. *Campbell,* 691 A.2d at 569. Rather, we examine the circumstances in their entirety as they existed at the time of the defendant's waiver and statement to the police. In this case, the record disclosed that at the time of his arrest, defendant was within two months of his eighteenth birthday and was, according to his own testimony, "on the run" from a DCYF group home. The

defendant had completed the eighth grade. Prior to Gardiner's murder, defendant had appeared before the Rhode Island Family Court on various charges on about four or five occasions and each time had been represented by the same attorney from the Office of the Public Defender. Approximately four months prior to his arrest for the murder of Gardiner, defendant had pleaded guilty in a Connecticut court to a charge of third-degree burglary and, having been charged as an adult, received a suspended sentence of three years with three years' probation.

Prior to taking a statement from defendant, Allen testified that he presented him with a form summarizing his *Miranda* rights and directed defendant to read each right aloud "to make sure he understood each and every right." Observing that defendant exhibited difficulty in pronouncing some of the words on the rights form, Allen had Katsetos read each right to defendant. After each right was read aloud by Katsetos, defendant was asked if he understood it, and after responding in the affirmative, defendant complied with Allen's request to place his initials by each right on the form as further indication of his comprehension. The defendant also signed the rights form.

Following this exercise, Allen, still "want[ing] to make sure that [defendant] really understood his rights," asked defendant to "explain to me in his own words * * * every individual right." Allen typed his questions and defendant's responses thereto directly onto the witness-statement form at the police station. The following exchange was recorded on the police report.

"Q. Michael it is now 11:37[PM] on 11/27/94 I have just read you your constitutional rights You have the right to remain silent do you understand what that means?

"A. If I do not want to talk I don't have to.

"Q. That anything I say can be used against me, do you understand what that means?

"A. Anything I say can be used against me as evidence.

"Q. That I have the right to a lawyer before and during any questioning?

"A. If I donot want to talk until a lawyer gets here I donot have to.

"Q. If I can not afford a lawyer one will be appointed for me before any questioning?

"A. Yes, the state will get me a lawyer.

"Q. Do you understand these rights that have been explained to you?

"A. Yes.

"Q. Do you wish to give us a statement now?

"A. Yes"

In denying defendant's motion to suppress the statements to police, the trial justice, in a considered analysis with which we concur, stated:

"[I]t's pretty clear from the recitation that the defendant gave to the officers, where he explained the various rights to the officers * * * that he explained to them what each right meant. * * * [The defendant] indicated at the hearing this afternoon that he had been in Family Court on four or five occasions. He had a lawyer each time. He knew it was a Public Defender. So, this man knows he's entitled to a lawyer; he knows he doesn't have to say anything. He's fully cognizant in November of 1994 of his rights. Of course, his past experience is not to be overlooked. * * * The fact that he signed the rights form, [put his] initials along various rights, is important and not without significan[ce]. * * * There has been no suggestion to me from Mr. Lambert that he didn't understand his rights. He simply said he had never really been in a situation like this before. I suspect that is true. He probably had never been charged with murder before, but that didn't lessen his level of comprehension of his rights or otherwise diminish his understanding of his right to silence and right to demand a lawyer. * * * I see no overreaching on the part of the police at all. I think they assiduously guarded his rights. * * * Here we have a young man just shy of his 18th birthday; streetwise; has been to court; had lawyers; been in trouble before. Without question, he knows his rights, and I'm satisfied that in all respects he was fully admonished of all

the rights necessary and all that he was entitled to in that regard. Further, he understood all of his rights, and he waived those rights fully, completely and unequivocally, without any overreaching or overbearing, or threats, or promises from the police officers."

We agree with former United States Supreme Court Justice William O. Douglas that "when * * * a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used." *Haley v. Ohio,* 332 U.S. 596, 599, 68 S.Ct. 302, 303–04, 92 L.Ed. 224, 228 (1948). Although defendant was not the "mere child" to which Justice Douglas referred, it is apparent not only that the trial justice used special care in scrutinizing the record, but that the Providence police detectives also conducted the interrogation of defendant carefully.

█ Our careful de novo review of the record before us has revealed that defendant's claim of coercive police activity is without merit. Although "[t]he police did indeed indicate that a cooperative attitude would be to [defendant's] benefit * * * their remarks in this regard were far from threatening or coercive." *Fare,* 442 U.S. at 727, 99 S.Ct. at 2573, 61 L.Ed.2d at 214. On the basis of the record and in light of the totality of the circumstances, we conclude that ample evidence existed to support the trial justice's finding that defendant's waiver was knowing, intelligent, and voluntary and that defendant fully understood his rights and the consequences of waiving them. Consequently, we hold that the trial justice properly denied defendant's motion to suppress his statement.

### Witness' Testimony Concerning Page's Out-of-Court Statements

█ During the course of Lambert's trial, the state presented a young witness named Joanna Rodrigues (Rodrigues), who testified regarding a conversation that took place among herself, Lambert, Page, and a few other friends at an abandoned downtown warehouse. According to Rodrigues, Page told the other youths that he and Lambert had "beat up the old guy that used to live under the bridge [because] they didn't like him." Rodrigues also testified that Lambert said he had hit the victim in the head with a gun and that they said "that one hit him in the face with the tube. It came out through his neck, and they hit him in the face with a gun a couple of times." Lambert's counsel objected to Rodrigues's testimony concerning both Page's statements and those that Rodrigues ambiguously attributed to Lambert and Page collectively. The trial justice overruled Lambert's objections on the ground that the statements were adoptive admissions and were therefore properly admissible under Rule 801(d)(2)(B) of the Rhode Island Rules of Evidence.[1]

█ When an incriminating or accusatory statement is made during a conversation that took place in the presence and hearing of an accused, and the statement is not denied by him or her under circumstances in which the repudiation of an untrue statement would be expected, the statement and the fact that the accused failed to deny it are admissible as an admission of the statement's truth and the accused's adoption of it as his own. *State v. Pacheco,* 481 A.2d 1009, 1014 (R.I.1984); *State v. Lerner,* 112 R.I. 62, 83–84, 308 A.2d 324, 338 (1973). Although we promulgated the Rhode Island Rules of Evidence in 1987, the test first set forth in *Lerner* continues to govern the admissibility of adoptive admissions pursuant to Rule 801(d)(2)(B). In order to admit testimony regarding an out-of-court statement as an adoptive admission, the trial justice should consider:

"(1) [whether] the statement was incriminatory or accusatory in nature;

"(2) [whether] it was one to which an innocent person in the situation of the defendant would reply;

"(3) [whether] it was made within the presence and hearing of the defendant;

---

1. Rule 801(d)(2)(B) of the Rhode Island Rules of Evidence provides "(d) *Statements Which Are Not Hearsay.* A statement is not hearsay if * * * (2) *Statement by Party–Opponent.* The statement is offered against a party and is * * * (B) a statement of which the party has manifested his or her adoption or belief in its truth."

"(4) [whether the defendant] understood the meaning of the statement; and

"(5) [whether the defendant] had an opportunity to deny or reply to the statement." *4 Wharton's Criminal Evidence* § 659 at 225 (Torcia 14th ed.1987).

*See Lerner,* 112 R.I. at 84, 308 A.2d at 338 (adopting five-part test); *see also Pacheco,* 481 A.2d at 1014–15 (restating same). In this case, the trial justice was careful to evaluate Rodrigues's testimony in accordance with these standards, and he was satisfied that each of the requisite factors was applicable to Page's statements at the warehouse. It is clear that Lambert participated in this conversation and had the opportunity to deny Page's assertions. Not only did Lambert fail to deny them, he in fact expanded upon them with his own statements. Rodrigues testified that after Page's initial statement, Lambert provided further details, telling the group that "they beat [him up and] hit him in the head with a gun, couple of times in his face." Consequently, we hold that the trial justice correctly applied the *Lerner* test, and therefore, the out-of-court statements were properly admitted.

**Jury Instructions on Aiding and Abetting**

The defendant argued that the trial justice erred in his instruction on the relationship between aiding and abetting and the crime of manslaughter. The trial justice charged the jury on aiding and abetting over defendant's objection, having refused defendant's requested instruction, which read in pertinent part, "If you find that defendant did not have the intention to kill Sylvester Gardiner but by his acts, his physical acts, he aided and abetted or assisted William Page in killing Sylvester Gardiner, than [*sic*] you must find the defendant guilty of [involuntary] manslaughter." The trial justice relied on our holding in *State v. Diaz,* 654 A.2d 1195 (R.I.1995), among other cases, in instructing the jury that

"[t]he guilt of a defendant may be established without proof that the defendant personally did every act constituting the offense or offenses charged. The law provides that whoever aids or abets, or assists another to commit a crime is nonetheless criminally liable as a principal. The law holds that everyone who knowingly and willfully participates in the commission of a crime is responsible for that crime just as if he had committed the crime alone. * * * [Y]ou must find beyond a reasonable doubt that there was a community of unlawful purpose at the time the criminal act was committed and that the defendant was a knowing, willing and active participant in that community in some way. In order to aid and abet another to commit a crime it is necessary that a defendant willfully associate himself in some way with the criminal venture and willfully participate in it as he would in something he himself wishes to bring about. Of course, you may not find a defendant guilty under the aiding and abetting theory unless you find beyond a reasonable doubt that every element of the offense which you are considering was committed by some person and that this defendant participated in its commission. Bear in mind that the law of aiding and abetting does not require that the defendant must foresee all of the consequences of the unlawful action in which he assists or participates, nor must every act of the defendant coincide with the action of the principal. A person who aids or abets is held responsible for the natural, or reasonable, or probable consequences of any act that he knowingly and intentionally aided or in which he assisted or participated."

The defendant cited *State v. Medeiros,* 535 A.2d 766 (R.I.1987), for the proposition that "if [defendant] deliberately participated in the assault but did not personally intend Mr. Gardiner's death * * * his legal liability [is] limited to conviction for manslaughter." This assertion is simply incorrect as a matter of law. This Court has defined manslaughter as "the unlawful killing of a human being without malice aforethought, either express or implied." *State v. Lillibridge,* 454 A.2d 237 (R.I.1982). Involuntary manslaughter is an "unintentional homicide without malice aforethought, committed either in performance of an unlawful act not amounting to a felony or in performance of a lawful act with criminal negligence." *State v. Hockenhull,* 525 A.2d 926, 929 (R.I.1987). In *Medeiros* the defen-

dant and two friends had grabbed the victim, Dennis Fontaine, on the street, after which one of the other men fatally stabbed Fontaine. *Medeiros,* 535 A.2d at 767. No evidence was offered of any independent malice, in the legal rather than the lay sense of the term, on the part of Medeiros. "Legal malice can arise from either an express intent to kill or to inflict great bodily harm or from a hardness of the heart, cruelty, wickedness of disposition, recklessness of consequence, and a mind dispassionate of social duty. * * * Malice consists of an unjustified disregard for the possibility of death or great bodily harm and an extreme indifference to the sanctity of human life." *State v. McGranahan,* 415 A.2d 1298, 1302 (R.I.1980). Medeiros argued that because he had lacked intent or malice, he could be convicted only of assault and battery. *Medeiros,* 535 A.2d at 772. This Court rejected that contention and sustained his conviction for involuntary manslaughter. *Id.*

Contrary to defendant's assertion, *Medeiros* is simply inapplicable to the case at bar. Nothing is clearer in this case than that both Page and Lambert acted with extreme malice in their attack on Gardiner. The State Medical Examiner, Elizabeth Laposata, M.D. (Laposata), testified regarding the grave bodily injuries that Gardiner sustained:

"In fact, the only other type [of] cases where I have seen this massive kind of force injury are in people who get hit by trains and really mutilated. Looked like he got hit by a train. If someone told me he was found by a train track I would have thought he was hit by a train."

Gardiner's facial bones were completely destroyed, an ax handle was impaled through his face, he had massive hemorrhaging injuries to his neck, and he had sustained serious injuries to his groin. Page's palm print was found on the ax handle, and Lambert's palm print was found on the handle of an ice chopper retrieved from the scene of the crime. Laposata testified that the ice chopper could have inflicted some of Gardiner's injuries, although Lambert testified in his own defense that he had picked up the ice chopper and discarded it without ever having wielded it against Gardiner. Lambert did

admit that he procured the rope with which Page bound Gardiner, that he kicked the victim, and that he struck him a few times with a light-weight broom handle. Laposata testified that Gardiner was alive during most of the beating, which she estimated took about ten minutes to inflict.

Given defendant's integral and active role in the savage and undeniably felonious assault on Gardiner, an involuntary manslaughter instruction such as that given in *Medeiros* would have been error. In sum, then, because the trial justice adequately summarized and instructed on the applicable law of Rhode Island on aiding and abetting, defendant's appeal on this issue must fail.

**Jury Instructions on Character Evidence**

■ The defendant's final argument on appeal is that the trial justice erred in refusing to instruct the jury on the legal relevance of character evidence. The defendant had requested that the trial justice give a charge similar to the one that this Court approved in *State v. Di Noi,* 59 R.I. 348, 195 A. 497 (1937), to wit:

" 'There is evidence here as to the defendant's good character in certain respects. Well, that is proper evidence upon the part of the defendant. When a man who has led a good life or has had a good character in certain respects is accused of a crime, he is entitled to cast into the scales his good name or his reputation, to weigh as far as it will in his favor. You are to consider that as part of the evidence here and give it such weight as you think he is entitled to or it is entitled to.' " *Id.* at 362, 195 A. at 503.

The significant differences between the evidence offered in *Di Noi* and that presented in the current case render defendant's reliance on *Di Noi* incorrect. We agree with the trial justice that it was appropriate in this case to leave the task of commenting on character evidence to the counselors' closing arguments, not to the judge's instruction.

■ The character evidence propounded by defendant was limited to the testimony of one witness, William Perkins (Perkins), who stated that he had known defendant for one year while he, Perkins, was a guidance coun-

selor and defendant was an eighth grader at Gorton Junior High School (Gorton) in Warwick, Rhode Island. Perkins testified that, to his knowledge, Lambert did not have a reputation for violence among his peers and the teachers at Gorton. Perkins also testified that as far as his own opinion was concerned, he did not think of Lambert as a violent person when he knew him. Testimony on the absence of a character trait, in this instance, violence, is commonly known as "negative evidence of character." The defendant did not offer any evidence, either by reputation or by opinion, that he was affirmatively known as a peaceful person.

In *Di Noi*, the defendant had offered both negative and positive evidence of his character. This Court sustained the trial justice's ruling that the negative evidence, which was similar to that admitted in the case at bar, was inadmissible. 59 R.I. at 361–62, 195 A. at 503. But DiNoi had also offered a "statement made to the jury by agreement, that three men who worked with defendant would testify, if present, *that they knew* the defendant's general reputation in the community as a peaceful man and that they knew his reputation to be good as a peaceful man." *Id.* at 362, 195 A. at 503. (Emphasis added.) It was this testimony that compelled the trial justice in *Di Noi* to charge the jury on the relevance of character evidence. Lambert, in contrast, offered no evidence whatsoever that he was affirmatively known as a peaceful and nonaggressive person in his general community at the time of the attack on Gardiner. The trial justice in the case at bar did not err in refusing to give a *Di Noi* instruction to the jury.

### Conclusion

For the foregoing reasons, we deny and dismiss the defendant's appeal and affirm the judgment of the Superior Court, to which the record in this case may be returned.