William PAGE

v.

STATE of Rhode Island.

No. 2004–105–Appeal.

Supreme Court of Rhode Island.

May 26, 2010.

See also, 705 A.2d 957 and 709 A.2d 1042.

Marie T. Roebuck, Office of the Public Defender, for Plaintiff.

Virginia M. McGinn, Department of Attorney General, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

The applicant, William Page, having been previously convicted of first-degree murder and sentenced to life imprisonment without the possibility of parole, appeals to this Court from the Superior Court's denial of his application for postconviction re-lief. On appeal, Mr. Page contends that his application should have been granted based on what he contends was the ineffective assistance of both his trial counsel and his appellate counsel.[1]

For the reasons set forth herein, we affirm the Superior Court's judgment denying postconviction relief with respect to applicant's representation by trial counsel—both during the trial itself and at the sentencing proceeding.

In addition, we have addressed the issue of the effectiveness (*vel non*) of applicant's representation before this Court on his direct appeal. Having determined that that representation was deficient due to appellate counsel's failure to petition this Court for *de novo* review of Mr. Page's sentence of life imprisonment without the possibility of parole, we have proceeded to conduct the statutorily authorized appellate review and have concluded that Mr. Page's sentence was appropriate.

## I

### Facts and Travel

The factual background of this case is described at length in two earlier decisions of this Court—*viz., State v. Page,* 709 A.2d 1042 (R.I.1998) and *State v. Lambert,* 705 A.2d 957 (R.I.1997). For the sake of brevity, we shall summarize in this opinion only the facts that are relevant to the issues implicated by this appeal.

### A

### The Trial

On December 6, 1995, following a jury-waived trial, Mr. Page was convicted of first-degree murder and of having committed a crime of violence while armed with a firearm (a BB gun); both convictions re-

---

1. All references to applicant's appellate counsel involve the attorney who represented him on his direct appeal and not the attorney representing him on the instant appeal.

lated to the brutal killing of Sylvester Gardiner. *Page*, 709 A.2d at 1044. Mr. Gardiner was a homeless man who was savagely beaten to death with a blunt axe handle by Mr. Page and another young man, Michael Lambert,[2] on Thanksgiving Day, November 24, 1994. *Id.* at 1043.

On May 3, 1996, the trial justice sentenced Mr. Page to life imprisonment without the possibility of parole; he also sentenced him to a concurrent ten-year sentence for having committed a crime of violence while armed with a firearm. In the course of imposing the sentence of life imprisonment without the possibility of parole, the trial justice stated that "[w]ithout question, the brutal murder of Mr. Gardiner was the most atrocious, barbaric killing imaginable." The trial justice acknowledged that he had "looked in vain for some mitigating factor which might somehow deter [him] from sending [Mr. Page] to prison for the rest of [his] life." The trial justice added that "[t]he only factor—if it is a factor at all—is [Mr. Page's] age."[3]

After focusing on Mr. Page's long history of violent and aggressive behavior, the trial justice addressed him as follows before pronouncing sentence:

"I would describe you, as have others, as violently savage and vicious, unnaturally sadistic, and relentlessly inhumane and totally incorrigible. I am convinced beyond all doubt that even at your age you are beyond rehabilitation. Society must be protected from the likes of you."

**B**

**The Direct Appeal**

Mr. Page appealed his conviction to this Court. His first contention on his direct appeal was that the incriminating statements that he made to the police after his arrest should have been suppressed[4] because (according to Mr. Page): (1) those statements were obtained through police coercion; (2) he was incapacitated by drugs and alcohol and thus was incapable of voluntarily waiving his *Miranda*[5] rights; and (3) he was wrongfully interrogated after he requested an attorney. *Page*, 709 A.2d at 1044. Mr. Page additionally contended on direct appeal that the ten-year concurrent sentence that he received (in addition to his sentence of life imprisonment without the possibility of parole) constituted cruel and unusual punishment in violation of his rights under the Eighth Amendment to the United States Constitution. *Page*, 709 A.2d at 1046. His final contention was that he had not been afforded effective assistance by his trial counsel. *Id.* This Court addressed those of Mr. Page's arguments that were properly before it on direct appeal.[6] The Court

2. In a separate trial (a jury trial) stemming from the murder of Sylvester Gardiner, Michael Lambert was convicted of second-degree murder. He was sentenced to life imprisonment, but *not* to life imprisonment without the possibility of parole. *State v. Lambert*, 705 A.2d 957, 959 (R.I.1997).

3. Mr. Page was eighteen years old when Mr. Gardiner was murdered and twenty years old at the time of sentencing.

4. Prior to Mr. Page's bench trial, his counsel filed a motion to suppress the incriminating statements that his client had made to the police; the trial justice denied that motion. *State v. Page*, 709 A.2d 1042, 1043–44 (R.I. 1998).

5. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. In its 1998 opinion, this Court acknowledged the presence of, but did not substantively rule upon, Mr. Page's allegations of ineffective assistance by his trial counsel, noting that it is the position of this Court that assertions of ineffective assistance of counsel must ordinarily be raised by means of an application for postconviction relief. *Page*,

ultimately rejected the appeal, affirming Mr. Page's conviction. *Id.* at 1047.

## C

### Postconviction Relief

Following this Court's affirmance of his conviction, Mr. Page, in reliance upon G.L. 1956 § 10–9.1–1, filed an application for postconviction relief in the Superior Court. (The record reveals that Mr. Page filed two applications, the first in 1998 and then an amended petition in 2002.) In his application, Mr. Page alleged ineffective assistance on the part of both his trial counsel and his appellate counsel.[7] On April 15, 2003, a postconviction relief hearing was held before the same justice of the Superior Court as had conducted Mr. Page's 1995 murder trial.

### 1. Assistance of Trial Counsel with Respect to the Trial

At the postconviction relief hearing, Mr. Page argued that his representation by his trial counsel constituted ineffective assistance of counsel.

Mr. Page's trial counsel was the sole witness at the postconviction relief hearing. Trial counsel testified that he had initially considered employing an insanity or diminished capacity defense. Counsel explained, however, that he decided against employing either defense in view of the fact that he was expressly told by the psychiatrist who had evaluated Mr. Page and with whom trial counsel had consulted that Mr. Page was "one of the most dangerous individuals [whom the psychiatrist had] ever met." Counsel testified that, in view of that assessment, he did not present the testimony of any psychiatrist or psychologist at trial because he believed that such testimony "could not help [his] client."

Trial counsel testified that he also investigated the potential defense of intoxication by speaking directly to Mr. Page regarding his use of drugs and alcohol at the time of the murder. Mr. Page informed counsel that on the day of the murder he had smoked a "blunt" (which we understand to be a reference to marijuana) and that, on the day of his arrest, he had smoked marijuana and consumed alcohol. Trial counsel testified that he conducted research into and made himself aware of the case law concerning the rela-

709 A.2d at 1046–47; *see also State v. Grayhurst,* 852 A.2d 491, 518–19 (R.I.2004); *State v. Brouillard,* 745 A.2d 759, 768 (R.I.2000).

With respect to Mr. Page's argument that the ten-year concurrent sentence constituted cruel and unusual punishment, this Court did not reach that argument in its 1998 opinion because Mr. Page's appellate argument linked that ten-year sentence to a completely erroneous predicate. (Mr. Page claimed on direct appeal that he had been sentenced pursuant to the habitual offender statute (G.L.1956 § 12–19–21), whereas the ten-year concurrent sentence which he challenged on constitutional grounds was in fact imposed for having committed a crime of violence while armed with a firearm.) The Court further noted that "a Rule 35 [of the Superior Court Rules of Criminal Procedure] motion determination is a prerequisite to an appeal to this court as to the propriety of a sentence;" and thus his direct appeal of his sentence, in addition to being based on an erroneous predicate, was deemed to be premature. *Page,* 709 A.2d at 1046 (quoting *State v. Baptista,* 632 A.2d 343, 345 (R.I.1993)).

7. "The Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution provide that in all criminal prosecutions, the accused shall enjoy the right to the assistance of counsel in his or her defense." *Brown v. State,* 964 A.2d 516, 526 (R.I.2009). Both the United States Supreme Court and this Court have recognized that "the right to counsel is the right to the *effective* assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (emphasis added); *see Heath v. Vose,* 747 A.2d 475, 477–78 (R.I.2000).

tionship between intoxication and culpability for first-degree murder. It is a fair inference from the record that trial counsel concluded, based on his conversations with Mr. Page and his research, that further attempts to use intoxication as a defense would not be a successful strategy. Counsel further testified that he did use the evidence of intoxication as one of the grounds for his motion to suppress the incriminating statements that Mr. Page had made after his arrest. He added that the trial justice denied that motion.[8]

Trial counsel further testified that he had attempted to reach a plea bargain with the Attorney General's Office in view of (1) the trial justice's ruling as to the admissibility of Mr. Page's incriminating statements; (2) the likely admissibility of certain gruesome photographs of Mr. Gardiner's brutally beaten body;[9] and (3) the fact that Mr. Page's fingerprints were present on one of the murder weapons. He added that his attempt to reach a plea agreement was unsuccessful.

It was further trial counsel's testimony that, when he realized that his plea bargaining attempt had not been successful, it was his belief that, in view of that adverse development and in view of the above-referenced formidable evidence of guilt, the best strategy would be *to focus on sentencing.* He testified that, at that point

in time, he advised Mr. Page of his view that the most advisable course of action would be to proceed with a jury-waived trial on the basis of stipulated facts.[10] Trial counsel testified at the postconviction relief hearing that, "given the heinous nature of the photographs and the act," he felt that it was unlikely that Mr. Page would have had the benefit of a truly "fair and impartial jury."

According to trial counsel's own testimony, it was his hope that, if defendant opted for a nonjury trial and stipulated to the evidence submitted by the prosecution,[11] the trial justice would manifest some degree of leniency towards him at sentencing. Counsel's hope was premised on the fact that, by opting for a nonjury trial with stipulated evidence, Mr. Page would thereby spare the victim's family the travail of having to endure the highly upsetting evidence about the murder that would surely take place in a drawn-out and explicit manner during a jury trial or during a bench trial with no stipulation as to the facts.[12]

After considering trial counsel's testimony at the postconviction relief hearing, the hearing justice rejected Mr. Page's claim of ineffective assistance of counsel during the trial itself. He found that, once his attempt to persuade the trial justice to suppress his client's confession proved un-

8. In its 1998 opinion, this Court affirmed the trial justice's ruling with respect to the motion to suppress. *See Page,* 709 A.2d at 1046.

9. It was trial counsel's opinion, based on his own experience as a practitioner, that the gruesome photographs of Mr. Gardiner's body alone would suffice to convict Mr. Page if he were tried before a jury.

10. Trial counsel stated that, due to the fact that Mr. Page was just nineteen years old at the time of trial, he consulted with the young man's stepfather with respect to counsel's advice that Mr. Page should waive his right to a jury trial and stipulate as to the facts. (Trial

counsel indicated that he had also discussed those issues with Mr. Page himself.)

11. Trial counsel testified that he advised Mr. Page to stipulate to the facts rather than to simply plead guilty because the latter option would have resulted in the waiver of his ability to appeal the denial of the motion to suppress his incriminating statements.

12. As was noted in this Court's 1998 opinion, Mr. Page was in fact eventually "tried before a justice of the Superior Court on stipulated proof that consisted solely of documents and exhibits." *Page,* 709 A.2d at 1044.

successful, trial counsel had faced overwhelming physical evidence and had been left with no realistic trial strategy. He was further satisfied that trial counsel had conducted a reasonable investigation into the possible defenses of diminished capacity and insanity; he noted that, after consulting with a psychiatrist and considering the psychiatrist's assessment, trial counsel had decided against employing either defense. The hearing justice was also satisfied with respect to trial counsel's investigation and decision-making relative to possibly raising a defense based on intoxication.

The hearing justice summarized as follows his perception of the situation confronting trial counsel before the trial began:

"[Trial counsel] had but one * * * chip to play. That was at least to preserve the issue of the confession for appellate review. That he did." [13]

Additionally, the hearing justice found that, based on the "horrendous" evidence (*viz.*, the photographs of the crime scene and the autopsy results), trial counsel made a reasonable decision, based on counsel's own experience, to advise Mr. Page to waive his right to a jury trial; the hearing justice also found that counsel consulted with both his client and his client's stepfather with respect to this strategy. The hearing justice further found that waiving a jury trial was consistent with counsel's ultimate goal of attempting to obtain leniency for his client at sentencing—a decision which the hearing justice stated he could not fault trial counsel for making. The hearing justice described trial counsel's advice to the effect that Mr. Page should waive his right to a jury trial and focus on making a plea for leniency at the time of sentencing as constituting "sound tactical decisions."

The postconviction relief hearing justice was not persuaded by Mr. Page's further contention that he might have been convicted of second-degree (rather than first-degree) murder had he opted for a jury trial.[14] In response to that argument, the hearing justice stated as follows:

"There is no way on God's green earth that I could conceive of ever inviting, at least in Mr. Page's case, anything but a first degree murder instruction to the jury based on the facts that would have been produced as I reviewed the file."

### 2. Assistance of Trial Counsel at Sentencing

With respect to his preparation for the sentencing proceeding, trial counsel testified as to his selection of a witness to testify on behalf of Mr. Page. He testified that, after speaking to the members of Mr. Page's family of whom he was aware, he "felt as though the best witness [for the sentencing proceeding] was his stepfather." Trial counsel testified that, in preparation for the sentencing proceeding, he had also reviewed Mr. Page's juvenile and adult records. He further stated that he had believed that there was a chance that he might convince the trial court to sentence Mr. Page to life *with* the possibility of parole in view of his age and the difficulties with which he had had to cope from childhood on.

---

13. The issue of the admissibility (*vel non*) of applicant's confession was in fact preserved for appellate review—although that review eventually proved unfavorable to applicant. *Page,* 709 A.2d at 1045–46.

14. It will be recalled that the jury before which Mr. Lambert had been tried convicted him of second-degree murder. *See* footnote 2, *supra.*

The transcript of the sentencing hearing[15] indicates that Mr. Page's stepfather testified and brought to the attention of the sentencing court the tragic situations with which Mr. Page had to deal at various times throughout his life.[16] During the sentencing hearing, trial counsel also highlighted the consideration that, by foregoing a full-blown trial, Mr. Page had not put the victim's family "through anymore tragedy." He additionally mentioned that he had attempted, albeit unsuccessfully, to reach a plea bargain with the prosecution. He also pointed out to the trial justice at the sentencing hearing that Mr. Page had "stepped to the plate in this case" by accepting responsibility for his actions. Trial counsel further reminded the court that Mr. Page was only twenty years old at the time of sentencing. (*See* footnote 3, *supra.*) He concluded his argument at the sentencing hearing by stating to the court that for Mr. Page life without the possibility of parole would be equivalent to a "death sentence;" he contended that what the young man needed instead was "some help."

With respect to trial counsel's efforts to mitigate his client's punishment at sentencing, the postconviction relief hearing justice quite bluntly rejected the contention that those efforts constituted ineffective assistance of counsel:

"[Mr. Page is] doing a life sentence without parole, not because of [trial counsel], but in spite of [trial counsel's] efforts. * * * You cannot lay at [trial counsel's] feet the blame for the life-without-parole

sentence. That was a decision I made based upon the egregious, horrendous activities that occurred in this murder. [Trial counsel] did what he could to minimize [Mr. Page's] exposure. In my view, good tactical decisions. He was hoping that I would not travel the route of a life-without-parole sentence, and he certainly argued well against it. I disagreed with him, and I doubt very much that he could have presented anybody that would have changed my mind that day, or today, for that matter."

In conclusion, the postconviction relief hearing justice stated that he was "satisfied in every respect that [Mr. Page] was effectively represented;" he therefore denied Mr. Page's application for postconviction relief with respect to his representation by trial counsel at sentencing.

### 3. Appellate Counsel

In his postconviction relief application, Mr. Page further alleged that his *appellate* counsel[17] had provided him with ineffective assistance because counsel had failed to argue on the direct appeal that, pursuant to G.L.1956 § 12–19.2–5, his client was entitled to a *de novo* review by this Court of the appropriateness (*vel non*) of his sentence of life without the possibility of parole. However, the postconviction relief hearing justice declined to pass upon this contention, stating that the Superior Court was not the proper forum for the consideration of claims of ineffective assistance by appellate counsel.

---

**15.** It will be recalled that both the trial itself and the postconviction relief proceedings were conducted before the same justice of the Superior Court. In other words, the postconviction relief hearing justice had actually heard *viva voce* the arguments made by counsel and the testimony of the witnesses at the sentencing hearing.

**16.** The tragic situations which trial counsel and defendant's stepfather described to the trial justice at the time of sentencing are briefly described in the Analysis portion of this opinion, *infra.*

**17.** On his direct appeal to this Court, Mr. Page was represented by an attorney other than his trial counsel.

## II

### Standard of Review and Controlling Legal Principles

■ By virtue of the provisions of § 10–9.1–1, "the remedy of postconviction relief is available to any person who has been convicted of a crime and who thereafter alleges either that the conviction violated the applicant's constitutional rights or that the existence of newly discovered material facts requires vacation of the conviction in the interest of justice." *Mattatall v. State*, 947 A.2d 896, 901 (R.I.2008); *see also Washington v. State*, 989 A.2d 94, 98 (R.I. 2010); *Larngar v. Wall*, 918 A.2d 850, 855 (R.I.2007). We note that an applicant for postconviction relief must bear "the burden of proving, by a preponderance of the evidence, that postconviction relief is warranted in his or her case." *Larngar*, 918 A.2d at 855; *see also Mattatall*, 947 A.2d at 901 n. 7.

■ This Court will not disturb the findings of a hearing justice in the postconviction relief context "absent clear error or a showing that the [hearing] justice overlooked or misconceived material evidence." *State v. Thomas*, 794 A.2d 990, 993 (R.I. 2002); *see also Mattatall*, 947 A.2d at 901. However, this Court reviews in a *de novo* manner "questions of fact concerning whether a defendant's constitutional rights have been infringed, and mixed questions of law and fact with constitutional implications * * *." *Ouimette v. State*, 785 A.2d 1132, 1135 (R.I.2001); *see also Mattatall*, 947 A.2d at 901; *Larngar*, 918 A.2d at 855; *Thomas*, 794 A.2d at 993.[18]

We have frequently indicated that "[t]he law in Rhode Island is well settled that this Court will pattern its evaluations of the ineffective assistance of counsel claims under the requirements of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." *Brennan v. Vose*, 764 A.2d 168, 171 (R.I.2001); *see also Washington v. State*, 989 A.2d at 99; *Armenakes v. State*, 821 A.2d 239, 245 (R.I.2003). In applying those principles, we have further stated that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Heath v. Vose*, 747 A.2d 475, 478 (R.I.2000) (quoting *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052).

■ The standard enunciated in *Strickland* has two prongs. *Strickland*, 466 U.S at 687, 104 S.Ct. 2052. First, an applicant must demonstrate "that counsel's performance was deficient, to the point that the errors were so serious that trial counsel did not function at the level guaranteed by the Sixth Amendment." *Brennan*, 764 A.2d at 171; *see also Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. To be considered ineffective under this deficiency criterion, trial counsel's performance must have fallen "below an objective standard of reasonableness * * * considering all the circumstances." *Brennan*, 764 A.2d at 171 (internal quotation marks omitted); *see Strickland*, 466 U.S. at 688, 104 S.Ct. 2052; *see also Rodrigues v. State*, 985 A.2d 311, 315 (R.I.2009) ("The Court will reject an allegation of ineffective assistance of counsel unless a defendant can demonstrate that counsel's advice was not within the range of competence demanded of attorneys in criminal cases.") (Internal quotation marks omitted.). It should also be

---

**18.** It should also be recalled that, even when we are conducting a *de novo* review with respect to issues of constitutional dimension, "we still accord great deference to a hearing justice's findings of historical fact and to inferences drawn from those facts * * *." *Mattatall v. State*, 947 A.2d 896, 901 (R.I.2008).

borne in mind that "a strong (albeit rebuttable) presumption exists that counsel's performance was competent." *Gonder v. State*, 935 A.2d 82, 86 (R.I.2007); *see also State v. Figueroa*, 639 A.2d 495, 500 (R.I. 1994).

▇ If deficient performance is found to have existed, the Court proceeds to the second step (or "prong") of the *Strickland* analytical scheme. At that second step, the applicant must demonstrate that the "deficient performance was so prejudicial to the defense and the errors were so serious as to amount to a deprivation of the applicant's right to a fair trial." *Brennan*, 764 A.2d at 171; *see Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Additionally, the prejudice prong of the *Strickland* test requires the applicant to show that there is "a reasonable probability that, *but for* counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052 (emphasis added).

It should also be remembered that, unless a defendant satisfies both prongs of the *Strickland* test, "it cannot be said that the conviction or * * * sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Simpson v. State*, 769 A.2d 1257, 1266 (R.I.2001) (quoting *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052); *see also Hazard v. State*, 968 A.2d 886, 892 (R.I.2009) ("[T]he applicant's failure to satisfy either prong will result in the denial of the claim of ineffective assistance of counsel.").

▇ Our review of an applicant's allegation of ineffective assistance of counsel at the sentencing phase in the trial court is governed by the same *Strickland*-based standards as govern our review of what took place during the trial itself. *See Porter v. McCollum*, — U.S. —, 130 S.Ct. 447, 452, — L.Ed.2d — (2009) (employing the *Strickland* standard in re-

viewing a claim of ineffective assistance of counsel at the penalty phase); *Rompilla v. Beard*, 545 U.S. 374, 380–81, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (reviewing a claim of ineffective assistance of counsel at the penalty phase pursuant to the *Strickland* standard); *Glover v. United States*, 531 U.S. 198, 203–04, 121 S.Ct. 696, 148 L.Ed.2d 604 (2001) (same). In *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), a death penalty case in which there was an allegation of ineffective assistance at the sentencing phase, the United States Supreme Court stated that, in reviewing counsel's performance, "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Id.* at 533, 123 S.Ct. 2527. The Supreme Court further stated that "strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation." *Id.* (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052).

▇ This Court also applies the test set forth in *Strickland* to arguments alleging ineffective assistance of *appellate* counsel. *Chalk v. State*, 949 A.2d 395, 398–99 (R.I.2008). We have stated that, for appellate counsel's performance to pass muster under the *Strickland* test, "appellate counsel * * * need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Chalk*, 949 A.2d at 399 (quoting *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000)); *see also Brown v. State*, 964 A.2d 516, 528 n. 16 (R.I.2009). This Court has further stated that, in order to satisfy both prongs of the *Strickland* analytical scheme with respect to a

claim that counsel's omission of an issue constituted the ineffective assistance of appellate counsel, "an applicant must demonstrate that the omitted issue was not only meritorious, but 'clearly stronger' than those issues that actually were raised on appeal." *Chalk*, 949 A.2d at 399 (quoting *Robbins*, 528 U.S. at 288, 120 S.Ct. 746).

# III

## Analysis

### A

### Trial Counsel's Performance with Respect to the Trial Itself

■ Mr. Page contends that the postconviction relief hearing justice erred in finding no ineffective assistance of counsel with respect to his representation during his trial. The applicant contends that his representation constituted "egregious ineffective assistance of trial counsel" because (in his view) trial counsel erred in: (1) failing to conduct an investigation into possible defenses and failing to present any defense at trial; (2) advising Mr. Page to waive his right to a jury trial; and (3) stipulating to the facts set forth by the prosecution.[19]

After a careful review of the record, we perceive no basis for holding that the hearing justice erred in ruling that Mr. Page was not deprived of the effective assistance of counsel at his trial. We are in agreement with the hearing justice's ruling that

Mr. Page's counsel acted well within the level of competence that is expected of trial attorneys representing criminal defendants.

Our review of the record convinces us that the hearing justice did not err in finding that Mr. Page's trial counsel sufficiently investigated the defense of insanity or diminished capacity. Counsel made the strategic decision not to employ such a defense after consulting with the psychiatrist who had examined his client and learning that the psychiatrist's observations regarding Mr. Page appeared more damaging than helpful. The hearing justice found counsel's choice to be an appropriate strategic decision, and we perceive no error (and certainly no clear error) in that finding.

Trial counsel also investigated the possible defense of intoxication by speaking with his client about that issue as it might relate to the pending criminal charges. We infer from trial counsel's testimony at the postconviction relief hearing that, after weighing his client's statements relative to possible intoxication and after conducting legal research concerning that subject, he determined that no potentially successful defense could be based upon that concept.[20] The postconviction relief hearing justice found that counsel's determination in that regard did not constitute ineffective assistance, and we perceive no basis in the

---

19. Mr. Page argues on appeal that just the failure of trial counsel to make a closing argument and the brevity of his bench trial (the transcript of which consists of only nine pages) establish that his trial counsel was ineffective. However, we consider this particular argument to have been waived. *See State v. Bido*, 941 A.2d 822, 828–29 (R.I. 2008).

20. It should be recalled that trial counsel expressly relied upon intoxication in his argument in support of his motion to suppress Mr.

Page's confession. *See Page*, 709 A.2d at 1044 ("The defendant argued * * * that he was so incapacitated by his ingestion of drugs and alcohol that he could not voluntarily waive his rights even though he understood them.").

In other words, even though trial counsel decided that that defense would be unavailing at trial, he was not reluctant to make reference to same as part of his motion to suppress—a motion which the hearing justice described as being the one "chip" available for trial counsel to play.

record for holding that finding to be clearly erroneous.

We turn next to the waiver of Mr. Page's right to a jury trial and the decision to let him be tried on stipulated proof (consisting solely of documents and exhibits).[21] As we have set forth in detail above, trial counsel was faced with a formidable amount of damaging evidence against his client (including the atrocious nature of Mr. Gardiner's murder, applicant's own incriminating statements, and the evidence of applicant's bloody fingerprints on the axe handle). He also became convinced that there was no defense strategy that had any meaningful chance for success on the merits. Trial counsel accordingly advised his client to proceed with a jury-waived trial in the hope of garnering leniency from the trial justice at the time of sentencing—advice which applicant appears to have accepted after counsel discussed the strategy with his stepfather as well as with him. The postconviction relief hearing justice found that the decision to waive a jury was a tactical decision and that it did not render trial counsel's assistance to be ineffective; he instead stated that he could not fault trial counsel for having made such a decision. The postconviction relief hearing justice further concluded that (by stipulating to the prosecution's evidence) trial counsel made a sound tactical decision in advising his client to spare Mr. Gardiner's family from the grief that a jury trial or a contested bench trial would entail—with the understanding that counsel would cite that considerateness towards the victim's family as a basis for a plea for mercy at the time of sentencing.

After considering the entire record, we are utterly unable to conclude that the postconviction relief hearing justice clearly erred in finding that trial counsel made

"sound tactical decisions" by advising applicant to waive a jury and to stipulate to the prosecution's evidence. We have previously stated that "a claim of ineffective assistance of counsel does not open the door for this Court to second-guess every decision made by defense counsel at trial." *Chalk*, 949 A.2d at 399; *see also Vorgvongsa v. State*, 785 A.2d 542, 549 (R.I.2001). With respect to the case at bar, we are unable to conclude that the postconviction relief hearing justice erred in holding that counsel's performance was reasonable and, as such, did not run afoul of even the first prong (deficiency) under the *Strickland* test. That being the case, we need not consider the second *Strickland* prong (prejudice).

In view of the several findings of fact made by the hearing justice, each of which we have held to be not clearly erroneous, and after our own perusal of the record, it is our judgment that Mr. Page was not deprived of his constitutional right to the effective assistance of counsel during his trial.

### B

### Trial Counsel's Performance with Respect to the Sentencing Proceeding

█ Mr. Page contends that the postconviction relief hearing justice erred in finding no ineffective assistance of counsel with respect to his representation at sentencing. The applicant alleges ineffective assistance of counsel with respect to trial counsel's alleged failure to investigate and to highlight for the benefit of the sentencing justice certain items contained within the state's presentence report, which items applicant contends would have had a mitigating effect. The applicant specifically

21. *See* footnote 12, *supra*.

points to evidence relating to (1) his learning disability; (2) his behavioral disorder; and (3) his history of substance abuse. He further alleges error in the fact that trial counsel did not bring to the attention of the sentencing court reports to the effect that he had made "progress" while serving a sentence at the Rhode Island Training School.[22]

Trial counsel testified at the postconviction relief hearing that, in addition to reviewing the presentence report which was submitted to the court, he interviewed his client's family members and concluded that his stepfather would be the person best suited to testify on Mr. Page's behalf at the time of sentencing. Mr. Page's stepfather did in fact testify at the sentencing hearing concerning the tragic situations that Mr. Page had experienced throughout his life. His stepfather informed the trial justice that Mr. Page's father and grandfather had both died from AIDS as a result of having used intravenous drugs. He also testified that Mr. Page experienced great difficulty in expressing his emotions with respect to those losses.

At the sentencing hearing, Mr. Page's trial counsel also vigorously cross-examined the prosecution's sole witness—*viz.*, the keeper of the records of the Adult Correctional Institutions, who testified as to several rules infractions committed by Mr. Page during his incarcerations at that penal institution.[23]

Trial counsel concluded his advocacy at the sentencing hearing by making a plea to the trial justice for leniency. In doing so, trial counsel highlighted the fact that Mr. Page had "stepped to the plate" and had accepted responsibility for Sylvester Gardiner's murder. Trial counsel also highlighted the fact that Mr. Page had waived his right to a jury trial and had agreed to the presentation of stipulated evidence, thereby relieving Mr. Gardiner's family from having to endure the presentation of the horrific evidence relative to the murder of Mr. Gardiner that would have taken place during a jury trial or even at a jury-waived trial if Mr. Page had not stipulated to the prosecution's evidence. Trial counsel also emphasized Mr. Page's young age, and he implored the trial justice to give Mr. Page "some hope" by sentencing him to life imprisonment *with* the possibility of parole.[24]

In support of his claim that his trial counsel rendered ineffective assistance during the penalty phase, applicant contends that trial counsel should have investigated favorable evaluations made by doctors who had assessed him while he was in residence at the Rhode Island Training School. The applicant further contends that his trial counsel should have more thoroughly highlighted the fact that his client had been diagnosed by a psychiatrist at the Training School as suffering from Attention Deficit Hyperactivity Disorder.

22. Prior to his arrest in connection with the murder of Mr. Gardiner, Mr. Page had been sentenced to the Training School by the Family Court on several occasions beginning in 1991 (when he was just fifteen years old).

23. It is worth mentioning that, during trial counsel's cross-examination of the witness from the Adult Correctional Institutions, the trial justice cut short the questioning and stated that, in sentencing Mr. Page, he did not intend to consider his behavior while incarcerated.

24. At the conclusion of the hearing, Mr. Page read a prepared statement to the sentencing court, in which he expressed remorse for his actions and apologized to the Gardiner family. He also expressed his desire to "change for the better," and he articulated his hope that he would be able to return to society as "a productive person." He also asked the sentencing court for a "second chance at life."

Finally, Mr. Page contends that his trial counsel should have informed the sentencing court that, in 1990, when he was approximately fifteen years old, his probation counselor had determined that he was operating at a fourth grade level in terms of intellectual function.

It is vitally important to note that the presentence report, which was made available to the trial justice before he imposed sentence, contained all of the above-referenced information that Mr. Page contends trial counsel should have highlighted during the sentencing hearing. We further note that the trial justice stated on the record that he had reviewed the presentence report. The presentence report contained portions of Mr. Page's juvenile records (which included progress reports that were prepared on each of the three occasions when he was sentenced to the Training School) as well as the mental health diagnoses which were the product of the clinical and psychiatric evaluations that he underwent while at the Training School. The progress reports from the Training School also included a comprehensive description of Mr. Page's home life, including the information that both his mother and father had used illegal substances and that his father and grandfather had both died of AIDS as a result of their intravenous drug use. In addition, Mr. Page's juvenile record indicated that he himself had used alcohol and marijuana; it also indicated that he had been functioning as a student at an intellectual level that was several years behind that of his peers.

It should be noted, however, that in addition to the "mitigating" information emphasized by applicant, his juvenile record also details his long history of violent behavior and his difficulty in controlling his anger. (That history includes reports concerning Mr. Page's having assaulted another resident in the Training School;

having assaulted staff members at the Training School; having been expelled from school for allegedly sexually assaulting another student; and having used violence as his primary coping mechanism.) The portions of Mr. Page's juvenile record that were before the trial justice detailed his several contacts with the Rhode Island Family Court—contacts that began in 1989, when he was thirteen years old. His juvenile record·also contains notations by psychiatrists who evaluated him and who then stated that he had a "long history of poor socialization and antisocial behavior, [and] poor impulse control." This psychiatric evaluation further stated that Mr. Page "[could not] function in the community."

We recognize that trial counsel has an "obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). However, after careful review of the transcript of the sentencing hearing and of the documents that were made available to the sentencing court, we are unable to conclude that the postconviction relief hearing justice erred when he found that Mr. Page's counsel had done what he could "to minimize [Mr. Page's] exposure" at sentencing. We also perceive no error in the postconviction relief hearing justice's observations that trial counsel had made "good tactical decisions" with respect to sentencing and that counsel had "argued well against" the imposition of a sentence of life without the possibility of parole.

We further note that applicant has failed to point to any significant mitigating evidence that was *not* provided to the trial justice through the presentence report; he has also failed to bring to our attention any additional information that might have been obtained through further investiga-

tion. The trial justice, after having reviewed the presentence report, stated that "[w]ords can't capture the essence of [Mr. Page's] uncontrollable, violent nature." The hearing justice additionally stated at the postconviction relief hearing that the evidence relative to the crime scene and the autopsy was the "worst [he had] seen in seventeen years on the bench, the worst, absolute worst." Moreover, during that postconviction relief hearing, the hearing justice expressed doubt that trial counsel could have presented *any* evidence that would have persuaded him not to sentence Mr. Page to life without the possibility of parole.

In light of the several findings of fact made by the postconviction relief hearing justice, which we have held to be not clearly erroneous, and after our own independent review of the record, it is our conclusion that Mr. Page was not deprived of his constitutional right to the effective assistance of counsel at sentencing.

## C

### Appellate Counsel's Performance with Respect to the Direct Appeal

■ We next consider Mr. Page's contention that his *appellate* attorney did not provide effective assistance of counsel in view of the fact that he failed to argue before this Court that Mr. Page was statutorily entitled to *de novo* consideration by us of his sentence of life without the possibility of parole.

The pertinent statute, G.L.1956 § 12-19.2-5, provides as follows:

"The defendant shall have the right to appeal a sentence of life imprisonment without parole to the [S]upreme [C]ourt of the state in accordance with the applicable rules of court. In considering an appeal of a sentence, the court, after review of the transcript of the proceedings below, may, in its discretion, ratify the imposition of the sentence of life imprisonment without parole or may reduce the sentence to life imprisonment."

We understand this statute to indicate that this Court should conduct a direct review of the facts of this case (to the extent that they are reflected in the transcript)—a role that is highly unusual for this Court to play, but one which we will undertake in deference to this unique statutory provision.

Although the statute does not employ the term *"de novo"* in referring to this Court's review process, we have consistently conducted our review of the life without parole issue in a *de novo* manner. *See, e.g., State v. Quinlan,* 921 A.2d 96, 112 (R.I.2007) (stating that, with respect to § 12-19.2-5, "[o]ur review is *de novo"*); *see also State v. McManus,* 941 A.2d 222, 235 (R.I.2008) ("In conducting our *de novo* review of the sentence, we must don the robes of a trial justice * * *.") (Internal quotation marks omitted.); *State v. Motyka,* 893 A.2d 267, 281 (R.I.2006) ("[T]he decision to impose a sentence of life imprisonment without the possibility of parole is * * * reviewed by this Court in a *de novo* manner.").

While appellate counsel did appeal (albeit without success) the trial court's imposition of a ten-year concurrent sentence,[25] he failed to make the further argument that a person sentenced to life without the possibility of parole, such as Mr. Page, has the statutory right to have the members of this Court determine in a *de novo* manner whether that sentence is appropriate.

In our judgment, the failure of applicant's appellate attorney to seek *de novo* review by this Court of the issue of the

---

**25.** *See* footnote 6, *supra.*

appropriateness of a sentence of life without the possibility of parole constituted ineffective assistance of appellate counsel. The statutory right to such *de novo* consideration by the members of this Court is clear. Thus, counsel's performance was deficient in his failure to raise Mr. Page's statutory right to have his sentence reviewed by this Court. *See Chalk,* 949 A.2d at 399. We further perceive that Mr. Page was prejudiced by his appellate counsel's failure to raise before this Court the contention that he had the right to that review. We view Mr. Page's statutory right to a review pursuant to § 12–19.2–5 to be "not only meritorious, but 'clearly stronger' than those issues that actually were raised on appeal." *See Chalk,* 949 A.2d at 399 (quoting *Robbins,* 528 U.S. at 288, 120 S.Ct. 746).

## D

### This Court's *De Novo* Review of the Sentence of Life Without the Possibility of Parole

▇ In this case, having found ineffective assistance of appellate counsel with respect to the failure of appellate counsel to invoke § 12–19.2–5, it is incumbent upon this Court to provide the remedy.

▇ We begin by noting that, pursuant to G.L.1956 § 11–23–2, "a sentence of life imprisonment without the possibility of parole may be imposed in a first-degree murder case when one of seven enumerated grounds is present." *Motyka,* 893 A.2d at 288; *see also State v. Pacheco,* 763 A.2d 971, 981 (R.I.2001).[26] The relevant statutory provision with respect to the case at bar is § 11–23–2(4), which references a first-degree murder that was "committed in a manner involving torture or an aggravated battery to the victim."

We have previously defined "aggravated battery" as meaning a "beating or infliction of traumatic force that is greater than necessary in order to render a victim helpless or to subject the victim to the will of the aggressor." *State v. Travis,* 568 A.2d 316, 323 (R.I.1990). We consider that description to be entirely applicable to the murder that occurred in this case. Mr. Gardiner's death was found by the medical examiner to have resulted from "[m]assive facial and craniocerebral injuries [due to] [b]lunt force trauma." The autopsy revealed that he suffered from blunt trauma to the neck, chest, abdomen, groin, and, most severely, to the head and face, ren-

---

26. General Laws 1956 § 11–23–2 provides in pertinent part as follows:
"Every person guilty of murder in the first degree shall be imprisoned for life. Every person guilty of murder in the first degree: (1) committed intentionally while engaged in the commission of another capital offense or other felony for which life imprisonment may be imposed; (2) committed in a manner creating a great risk of death to more than one person by means of a weapon or device or substance which would normally be hazardous to the life of more than one person; (3) committed at the direction of another person in return for money or any other thing of monetary value from that person; (4) committed in a manner involving torture or an aggravated battery to the victim; (5) committed against any member of the judiciary, law enforcement officer, corrections employee, assistant attorney general or special assistant attorney general, or firefighter arising from the lawful performance of his or her official duties; (6) committed by a person who at the time of the murder was committed to confinement in the adult correctional institutions or the state reformatory for women upon conviction of a felony; or (7) committed during the course of the perpetration or attempted perpetration of felony manufacture, sale, delivery or other distribution of a controlled substance * * * shall be imprisoned for life and if ordered by the court pursuant to chapter 19.2 of title 12 that person shall not be eligible for parole from imprisonment."

dering the victim (in the words of the trial justice) "virtually unrecognizable." The autopsy photographs indicate that one of the murder weapons, an axe handle, was lodged in the victim's head. As we noted in our previous opinion, the medical examiner who performed the autopsy on Mr. Gardiner described his injuries as being the "worst she had ever seen." *Page,* 709 A.2d at 1043. The trial justice at the time of sentencing similarly described the murder as "the most atrocious, barbaric killing imaginable." In his confession, applicant admitted that, during much of the savage beating, Mr. Gardiner remained conscious and was still moving. He further confessed that the beating of Mr. Gardiner continued after a rope was tied around his neck.[27]

Having thoroughly reviewed the evidence in the case, including the autopsy report, photographs, confession, and witness statements, there is no doubt in each of our minds that the evidence overwhelmingly demonstrates that the murder of Mr. Gardiner was "committed in a manner involving torture or an aggravated battery to the victim * * *." Thus, § 11–23–2(4) is satisfied, requiring us next to decide whether to "ratify the imposition of the sentence of life imprisonment without parole or [to] reduce the sentence to life imprisonment." Section 12–19.2–5.

In carrying out the statutorily required review, we first consider whether the "personal history, character, record, and propensities" of Mr. Page warrant the imposition of the sentence of life without the possibility of parole. *See* § 12–19.2–4; *Motyka,* 893 A.2d at 290; *see also State v. Tassone,* 749 A.2d 1112, 1119 (R.I.2000). In doing so, we must consider "any aggravating circumstances as well as any miti-

gating factors." *Quinlan,* 921 A.2d at 111–12; *see also Motyka,* 893 A.2d at 290 (examining aggravating factors along with mitigating evidence).

After having carefully scrutinized the evidence in this case, the findings of the trial justice, and the "personal history, character, record, and propensities" of the applicant, and having taken into account the mitigating factors cited by applicant, the members of this Court are in agreement that the sentence of life without the possibility of parole is appropriate in this instance. *See* § 12–19.2–4; *McManus,* 941 A.2d at 238.

We, like the trial justice, are of the view that there is only one significant mitigating factor that weighs in Mr. Page's favor, that being his age.[28] However, in view of the heinousness of the crime and the blatant disregard for human life that Mr. Page exhibited in committing that crime and in view of his long history of violating the law and his repeated manifestations of violence, aggression, and anger, we conclude that his case warrants the imposition of the sentence of life without the possibility of parole. We take note that, at the time of sentencing in the Superior Court, the trial justice highlighted portions of Mr. Page's Training School records in which professionals had indicated that Mr. Page was "full of anger [and] aggressiveness," had already committed crimes of robbery and assault by the age of seventeen, exercised "poor impulse control," utilized "violence as a primary coping strategy," and was "resentful, socially arrogant and provocative, with a desire to provoke fear and intimidate others." The trial justice stated that he had "absolutely no doubt that [Mr. Page was] the primary culprit in this savage killing, and that [Mr. Page was]

---

**27.** For a further description of the brutality that accompanied the murder of Mr. Gardiner, *see Page,* 709 A.2d at 1043.

**28.** *See* footnote 3, *supra.*

the one who, with a final Satanic flurry, drove an ax handle through the victim's head." Having completed our own review of the record in this case, including the presentence report, we reach the same conclusion as did the trial justice with respect to Mr. Page's violent character and propensities. The intimidating behavior and inability to control his anger that Mr. Page has demonstrated has led us to conclude that he is a dangerous individual, who possesses an enduring potential for violence. We further agree that the mitigating factor (his age) does not outweigh the numerous aggravating factors that have been established in this case and that justify a sentence of life without the possibility of parole.

We find ourselves hard-pressed (as was the trial justice) to find sufficient words to describe the atrocity of the crime that was committed against Mr. Gardiner, an unassuming stranger. Having completed our independent review and exercising the discretion that is mandated by statute, we are convinced that the trial justice's imposition of the sentence of life imprisonment without the possibility of parole was appropriate, and we ratify the imposition of same. *See* § 12–19.2–5.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court denying postconviction relief with respect to the applicant's representation at trial and at the sentencing proceeding in the Superior Court. In addition, we have addressed the issue of the effectiveness of the applicant's representation before this Court; and, having found that that representation was wanting in one respect, we have proceeded to conduct the review provided for in § 12–19.2–5. We have in the end concluded that the sentence of life imprisonment without the possibility of parole was appropriate, and we have ratified the imposition of that sentence.

The record may be remanded to the Superior Court.

Justice INDEGLIA took no part in the consideration or decision of this appeal.

Justice FLAHERTY, concurring in part and dissenting in part.

I concur in all aspects of the majority's well-written and well-reasoned opinion, save one: the affirming of the sentence of life without the possibility of parole. From that part of the majority's opinion, I must respectfully depart.

I agree with my colleagues that the assault on Mr. Gardiner was carried out with almost incomprehensible savagery. However, I believe that, perhaps affected by the unquestionable brutality of the crime, the majority has determined too quickly that Mr. Page is incapable of reform.

The record reveals a young man who has been driven by rage and an inability to control either his anger or his violent impulses throughout most of his short life. He has been diagnosed with attention deficit hyperactivity disorder and has IQ values in the low range. He is a product of a dysfunctional family; both of his parents were drug addicted, and his father and grandfather were HIV positive, likely as a result of drug use. His father eventually died of AIDS.

Of course, none of this excuses the brutality of his actions, for which he deserves a life sentence. But, in my view, when one considers the obstacles with which he has been confronted, coupled with his young age, the chance for rehabilitation exists, and Mr. Page should not be consigned to the rubbish heap of life.

This is not a case of still another crime by a career criminal, or of a felony where barbarism was combined with a planned criminal venture. *See, e.g., State v. Graham,* 941 A.2d 848, 867 (R.I.2008) (determining that defendant was likely beyond rehabilitation given his "life of crime" and affirming sentence of life without parole imposed for his conviction of committing murder for hire); *State v. Brown,* 898 A.2d 69, 72, 86–87 (R.I.2006) (concluding that defendant's numerous convictions and contacts with law enforcement rendered his "prospects for rehabilitation" bleak and affirming sentence of life without parole for his conviction for the sadistic murder of an acquaintance); *State v. Motyka,* 893 A.2d 267, 271–72, 290–91 (R.I.2006) (affirming sentence of life without parole where defendant, who had "prior criminal contacts" involving kidnapping, high-jacking, and assault, returned to the home where he previously had performed construction work and committed the heinous murder of the homeowner); *State v. Harnois,* 853 A.2d 1249, 1251, 1257 (R.I.2004) (affirming sentence of life without parole following defendant's conviction for his "deliberate planning and facilitation" of a successful murder for hire of his wife); *State v. Travis,* 568 A.2d 316, 326 (R.I.1990) (discussing defendant's prolific criminal career, including previous convictions for robbery, and affirming sentence of life without parole for his conviction of first-degree murder perpetrated in the commission of a robbery). By contrast, this unquestionably heinous act was the product of happenstance and the amoral impulses of a very troubled young man.

Life without parole for youthful offenders has been grist for the mill for a number of thoughtful law review articles. *See, e.g.,* Lauren Fine, *Death Behind Bars: Examining Juvenile Life Without Parole in Sullivan v. Florida and Graham v. Florida,* 5 Duke J. of Const. L. & Pub.

Pol'y 24, 41, 41–42 (2009) (proposing that the sentence of life without parole for juveniles does not achieve incarceration's goals of deterrence and rehabilitation and should be held unconstitutional, in part because "[i]t is not until age twenty-one that individuals experience 'tremendous gains in emotional maturity, impulse control and decision making' that continue until the brain becomes fully developed in the mid-twenties"); Jeffrey Fagan, *End Natural Life Sentences for Juveniles,* 6 Criminology and Pub. Pol'y 735, 744 (2007) (arguing that no "extra benefits to crime control or to retributive justice" flow from a sentence of life without parole imposed on a juvenile).

In his majority opinion for the United States Supreme Court in *Roper v. Simmons,* 543 U.S. 551, 573–74, 578, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), which held the imposition of the death penalty for offenders who were under eighteen years old at the time of the crime to be unconstitutional, Justice Kennedy said, "When a juvenile offender commits a heinous crime, the State can exact forfeiture of some of the most basic liberties, but the State cannot extinguish his life and his potential to attain a mature understanding of his own humanity."

I am fully aware that the writings referred to above address the subject of life without parole for juveniles and that Mr. Page had passed the threshold of majority, if just barely, when he murdered Mr. Gardiner. But while there must be some arbitrary bright-line demarcation between youth and adulthood, there is no question that few, if any, young people are imbued with the attributes of adulthood as soon as their eighteenth birthday is achieved.

Finally, this is not to say that Mr. Page ever should be entitled to parole or that it ever should be granted to him. In any

case, one sentenced to life in prison is not parole eligible until he has served at least fifteen years. G.L.1956 § 11–23–2.2. If Mr. Page were eligible for parole, he would not have the opportunity until his mid-thirties to demonstrate to the parole board that he has reformed, matured, and that he is no longer the angry, violent, and impulsive person that he was at age eighteen. He would have the opportunity to show that he has changed, perhaps through counseling, education, maturity, or by embracing religious faith.

Of course, he may not prove a change in character to the satisfaction of the parole board and may indeed fail to show that he is fit for a return to law-abiding society; that is a determination for the board. Al-

though I concede that this is a close case, in my opinion, Mr. Page should not be denied the opportunity for reform and for a return to society for the remainder of his natural life.

For these reasons, I respectfully dissent from the majority's affirmance of Mr. Page's sentence of life without the possibility of parole, and would have reduced the sentence to life imprisonment in accordance with G.L.1956 § 12–19.2–5.